**Helen HOLT, as Personal Representative of the Estate of William Miller, III, Deceased, Appellant–Plaintiff,**

v.

**QUALITY MOTOR SALES, INC., Appellee–Defendant.**

No. 34A02–0202–CV–164.

Court of Appeals of Indiana.

Aug. 20, 2002.

Publication Ordered Oct. 3, 2002.

Desiree E. Bannasch, Desiree E. Bannasch, P.A., Orlando, FL, Attorney for Appellant.

Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans, P.C., Kokomo, IN, Attorney for Appellant.

Kenneth Collier-Magar, Liberty L. Roberts, Collier–Magar & Roberts, P.C., Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROOK, Chief Judge.

### Case Summary

Appellant-plaintiff Helen Holt ("Holt"), as personal representative of the estate of William Miller, III, deceased ("William"), appeals the trial court's entry of final summary judgment in favor of appellee-defendant Quality Motor Sales, Inc. ("Quality"). We affirm.

### Issue

Holt raises five issues for review, one of which we find dispositive and restate as follows: whether Quality owed a duty of care to William.

### Facts and Procedural History

The designated facts most favorable to Holt as the non-moving party indicate that on or about December 23, 1997, Mary Harrison ("Harrison") purchased a 1992 Pontiac Grand Prix ("the Pontiac") from Quality in Kokomo, Indiana. The Pontiac had an odometer reading of 64,199 miles and came with a thirty–day/1000–mile limited warranty for "[i]nternal moving lubricated

parts in the transmission." Appellee's App. at 24, 25. On or about January 21, 1998, Harrison returned the Pontiac to Quality complaining of an intermittent "squeak". Appellant's App. at 114. Quality mechanic Robert Melanson ("Melanson") inspected the Pontiac's braking system and replaced one of the brake rotors. After Harrison retrieved the Pontiac from Quality, she did not experience further "squeaking" or any mechanical problems.

Sometime after January 21, 1998, Harrison and her friend William, whose driver's license was suspended, drove the Pontiac on an extended trip through Kentucky, Tennessee, Mississippi, Arkansas, Alabama, and Florida. During the trip, neither Harrison nor William experienced any problems with the Pontiac's braking system. In March 1998, Harrison and William visited William's family for approximately one week in Orlando, Florida. According to Joshua Miller ("Joshua"), William's brother, Harrison gave William "express and implied permission [to drive the Pontiac] by requesting that he drive the car for the entire week as she did not know her way around the Orlando area." *Id.* at 106.

On March 23, 1996, William, Joshua, and Harrison dined at a Chili's restaurant in Orange County, Florida. The trio had no money to pay the bill and attempted to leave the restaurant. A restaurant manager detained Harrison, but Joshua and William ran to the Pontiac. William drove to the front of the restaurant and honked the horn; when Harrison did not emerge, the brothers drove off in the Pontiac. Harrison was arrested and incarcerated in the Orange County Jail. William and Joshua located Harrison in the jail but "were told that she was being processed and it would be five or six hours before she could be bailed out." *Id.* On the evening of March 23, William mentioned to his father that "he had heard some noise in the brakes [of the Pontiac] and thought they felt spongy." Appellant's Supp.App. at 101. William's father told William that he "would take a look at the brakes the following day when [he] returned home from work[.]" *Id.*

On March 24, 1998, before Harrison was released from jail and before their father could examine the brakes, William and Joshua were traveling in the Pontiac on Old Mims Road in Seminole County, Florida. As they approached the intersection of Snow Hill Road, Joshua twice informed William, who was not familiar with the road, that there was a stop sign hidden behind a tree at the intersection. William applied the brakes, which did not work, and the Pontiac continued into the intersection at fifteen miles per hour over the posted thirty-five-miles-per-hour speed limit. A vehicle traveling southbound on Snow Hill Road collided with the westbound Pontiac. William was partially ejected from and fatally crushed by the Pontiac. Joshua was ejected from the Pontiac and suffered serious injuries. At the time of the collision, the Pontiac's odometer registered 78,224 miles.[1]

On March 22, 2000, as personal representative of William's estate, Holt filed a wrongful death complaint against Harrison and Quality, alleging, *inter alia*, that Quality negligently repaired the Pontiac's braking system and negligently failed to warn Harrison of the "unsafe and defective condition" of the braking system.[2] Appellant's App. at 10.

---

1. The source of this figure is the cancellation request form for Harrison's insurance policy on the Pontiac, which lists a cancellation date of March 24, 1998. *See* Appellee's App. at 16.

2. Harrison is not a party to this appeal.

On January 22, 2001, Quality filed a motion for summary judgment asserting that it owed no duty of care to William and that Holt could not "produce any admissible evidence to establish a proximate cause of injury or death from a breach of duty in this case." *Id.* at 14.[3] In support of its motion, Quality designated, *inter alia*, William's official Indiana driving record and the Florida Highway Patrol's traffic homicide investigation report.

On May 15, 2001, Holt responded to Quality's motion. In her response, Holt claimed that Quality owed William a duty of care; that William "died as a proximate result of Quality['s] failure to properly inspect and repair the braking system on the [Pontiac]", *id.* at 42; that William's driving record was inadmissible under Indiana Evidence Rule 404(b); and that the Florida Highway Patrol report was inadmissible as hearsay within hearsay. In support of her response, Holt designated, *inter alia*, the affidavit and assessment of professional engineer Boyd Cochrane ("Cochrane"), who inspected the Pontiac after the fatal accident. In his affidavit, Cochrane opined that "air was most probably introduced into the [Pontiac's] brake line during the service performed by Robert Melanson in January, 1998" and that "Melanson's failure to remove this air by 'bleeding' the brake line after this service substantially contributed to the sudden brake failure that occurred on March 24, 1998." *Id.* at 177.

On July 26, 2001, Quality asserted as a supplemental affirmative defense and in a supplemental motion for summary judgment that William "assumed and incurred the risk of his injuries." *Id.* at 50, 52. In support of its supplemental motion, Quality designated the affidavits of William's father, Quality's principal owner Steven Hart, Quality mechanic Melanson, and ASE certified mechanic Larry Williams. Also on that date, Quality filed a reply memorandum in which it urged the trial court to reject Cochrane's affidavit and assessment as inadmissible under Indiana Evidence Rule 702. On August 23, 2001, Holt responded to and moved to strike Quality's supplemental motion and designated evidence.

On September 10, 2001, the trial court heard argument on Quality's summary judgment motion and Holt's motion to strike and took the motions under advisement. On January 2, 2002, in an order granting Quality's motion for summary judgment, the trial court ruled that Cochrane's affidavit was inadmissible under Evidence Rule 702(b) and denied "Motions to Strike all other affidavits". *Id.* at 89. On Holt's motion, the trial court entered its order as a final judgment on January 30, 2002. Holt now appeals.

### Discussion and Decision

#### Standard of Review

"The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law." *Harris v. Traini,* 759 N.E.2d 215, 220 (Ind.Ct.App.2001), *trans. denied* (2002). "A trial court's grant of summary judgment is clothed with a presumption of validity on appeal, and the appellant bears the burden of demonstrating that the trial court erred. Nevertheless, the record must be carefully scrutinized to ensure that the plaintiff was not improperly de-

---

**3.** We remind Quality that under Indiana's summary judgment standard, "the party seeking summary judgment must demonstrate the absence of any genuine issue of fact as to a determinative issue, and only then is the non-movant required to come forward with contrary evidence." *Jarboe v. Landmark Cmty. Newspapers of Indiana, Inc.,* 644 N.E.2d 118, 123 (Ind.1994).

nied a day in court." *Lutz v. Fortune,* 758 N.E.2d 77, 81 (Ind.Ct.App.2001) (citation omitted), *trans. denied* (2002).

■ "In determining the propriety of summary judgment, we apply the same standard as the trial court." *Harris,* 759 N.E.2d at 220.

We must determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. We must consider the pleadings and evidence designated pursuant to Ind. Trial Rule 56(C) without deciding their weight or credibility. Summary judgment should be granted only if such evidence shows there is no genuine issue of material fact and judgment is warranted as a matter of law.

The party moving for summary judgment has the burden of making a *prima facie* showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Once the moving party meets these two requirements, the burden then shifts to the non-moving party to show the existence of a genuine issue by setting forth specifically designated facts. Any doubt as to any facts or inferences to be drawn therefrom must be resolved in favor of the non-moving party.

*McClain v. Chem–Lube Corp.,* 759 N.E.2d 1096, 1100–01 (Ind.Ct.App.2001) (citations omitted), *trans. denied* (2002). "If the trial court's summary judgment can be sustained on any theory or basis in the record, we must affirm." *Harris,* 759 N.E.2d at 221.

■ As previously mentioned, Holt alleged in her wrongful death complaint that Quality negligently repaired the Pontiac's braking system and negligently failed to warn Harrison of the "unsafe and defective condition" of the braking system. Appellant's App. at 10.

To premise a recovery on a theory of negligence, a plaintiff must establish three elements: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach.

*Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991). "A defendant in a negligence action may obtain summary judgment by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim." *Harris,* 759 N.E.2d at 226.

■ "Summary judgment is rarely appropriate in negligence actions; however, issues of duty are questions of law for the court and may be appropriate for disposition by summary judgment." *Cunningham v. Bakker Produce, Inc.,* 712 N.E.2d 1002, 1004 (Ind.Ct.App.1999), *trans. denied; see also Webb,* 575 N.E.2d at 995 ("Whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff is a question of law."). "When found to exist, the duty is to exercise reasonable care under the circumstances, and this duty never changes." *Franklin v. Benock,* 722 N.E.2d 874, 878–79 (Ind.Ct.App.2000).

■ In their respective briefs, the parties debate whether Holt's complaint alleges misfeasance or nonfeasance and whether evidence exists of a special relationship between Quality and William that would give rise to a duty of care. *See, e.g., J.A.W. v. Roberts,* 627 N.E.2d 802, 809 (Ind.Ct.App.1994) ("This court has held that when a defendant's alleged negligence arises from nonfeasance, the complete

omission or failure to perform, as opposed to misfeasance, negligent conduct or active misconduct, then the duty to act must arise from a special relationship between the parties."). In our view, however, the distinction between nonfeasance and misfeasance was abandoned by our supreme court in *Webb v. Jarvis*, in which it concluded that the following three factors must be balanced in considering whether to impose a duty at common law: "(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns." *Webb*, 575 N.E.2d at 995.[4]

## A. Relationship Between the Parties

■■■■ William's relationship to Quality is attenuated at best. He was neither the purchaser nor the owner of the Pontiac, and the facts are disputed as to whether he had Harrison's permission to drive the Pontiac on the day of his fatal accident.[5] In her complaint, Holt alleged that Quality negligently failed to inform *Harrison* of the allegedly unsafe and defective braking system, but in her appellate brief she offers no cogent argument that Quality had a duty to inform *William* about the brakes, let alone to repair them properly on his behalf. Holt baldly asserts that

4. In concluding that nonfeasance and misfeasance are no longer relevant concepts in Indiana negligence law, we find persuasive Judge Sullivan's dissent in *J.A.W.*, which reads in relevant part as follows:

> The fact remains, negligence, i.e., the failure to exercise reasonable care under the circumstances, does not depend upon whether the conduct is misfeasance or nonfeasance. *In other words, negligence is negligence.* Necessarily, then, the analysis by which the existence of a duty is found to exist does not depend upon the distinction. *See Miller v. Griesel* (1974) 261 Ind. 604, 308 N.E.2d 701.
> *Webb v. Jarvis* (1991) Ind., 575 N.E.2d 992, which controls our determination as to whether a duty existed between any or all of the various defendants and J.W., also involved misfeasance by a physician, i.e., over prescribing anabolic steroids for a patient who in turn shot a third party. The suit was by the third party against the doctor. *Webb draws no distinction between misfeasance and nonfeasance.*

*J.A.W.*, 627 N.E.2d at 815 (Sullivan, J., dissenting in part) (emphases added). Although several opinions of this court issued after *Webb* have addressed the question of nonfeasance/misfeasance in determining the existence of a duty, *see, e.g., J.A.W.*, 627 N.E.2d at 809, *Estate of Cummings by Heck v. PPG Industries, Inc.*, 651 N.E.2d 305, 309 (Ind.Ct. App.1995), *trans. denied* (1996), none of *Webb's* supreme court progeny have done so.

5. In a classic example of "dueling affidavits," Harrison stated that she permitted William to

drive the Pontiac "from time-to-time, but only when I was the passenger in my vehicle.... I never allowed him to drive my vehicle with my being in the car due to the fact that he took my car one time, got arrested, and my vehicle was impounded." Appellant's App. at 103. In a second affidavit, Harrison stated that "[a]t no time on March 23 or March 24, [1998,] did William or Joshua have my permission, express or implied, to operate my automobile." *Id.* at 102. However, Joshua stated that Harrison "had given [William] express and implied permission [to drive the Pontiac] by requesting that he drive the car for the entire week as she did not know her way around the Orlando area." *Id.* at 106. In a second affidavit, Joshua stated that he

> never heard Mary Harrison make any statement to the effect that William was not allowed to drive her vehicle unless she was a passenger. On several occasions while staying at the home of my father [in Florida], I rode with my brother in Mary Harrison's vehicle to the store while she stayed at my father's house. On other occasions, my brother took the car and Mary and I stayed at my father's house. She voiced no objection at any time to him taking her car without her in it.

*Id.* at 108. Without attempting to resolve this factual dispute, we simply observe that it is difficult to imagine that Harrison either expressly or impliedly authorized William to drive away from the restaurant in her Pontiac after she was apprehended by the restaurant manager and left alone to face the music and the authorities.

"Quality's duty of care runs to anyone who might be hurt by the defect in the brakes." Appellant's Br. at 22.[6] However, as our supreme court stated in *Webb*, " '[t]he duty of reasonable care is not, of course, owed to the world at large, but rather to those who might reasonably be foreseen as being subject to injury by the breach of the duty.' Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." *Webb*, 575 N.E.2d at 997 (citation omitted).

### B. Foreseeability

In *Goldsberry v. Grubbs*, 672 N.E.2d 475 (Ind.Ct.App.1996), *trans. denied* (1999), Judge Kirsch distinguished between "the foreseeability component of the duty analysis and the foreseeability component of proximate cause" as follows:

Foreseeability in the context of proximate cause involves evaluating the particular circumstances of an incident after the incident occurs. According to the American Law Institute, foreseeability for proximate cause purposes is determined from a perspective that is "after the event and looking back from the harm to the actor's negligent conduct." As stated in Indiana, "[a] negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." Thus, when determining proximate cause, foreseeability is determined based on hindsight, and accounts for the circumstances that actually occurred.

By logical deduction, the foreseeability component of the duty analysis must be something different than the foreseeability component of·proximate cause. More precisely, it must be a lesser inquiry; if it was the same or a higher inquiry it would eviscerate the proximate cause element of negligence altogether. If one were required to meet the same or a higher burden of proving foreseeability with respect to duty, then it would be unnecessary to prove foreseeability a second time with respect to proximate cause. Additionally, proximate cause is normally a factual question for the jury, while duty is usually a legal question for the court. As a result, the foreseeability component of proximate cause requires an evaluation of the facts of the actual occurrence, while the foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence.

*Id.* at 479 (citations and footnote omitted, brackets in *Goldsberry* ).

Without considering the specific facts of the instant case, we acknowledge that it is reasonably foreseeable that a person other than the purchaser of a used car may drive the car and suffer injury in an accident caused by mechanical failure. However, the mere foreseeability of such an occurrence is not determinative with respect to the existence of a duty, given that we must also consider the relationship between the parties and public policy concerns.

**6.** In her reply brief, Holt argues for the first time that "dealers in used equipment have a duty to inspect and discover patent defects in the used equipment that [they sell]" and that "[a] duty may arise where one party assumes such a duty, either gratuitously or voluntarily." Appellant's Br. at 11, 12. "Any argu-

ment not presented in the original brief is waived and a party may not revive it by arguing the issue in the reply brief." *Lakes and Rivers Transfer, a Div. of Jack Gray Transp., Inc. v. Rudolph Robinson Steel Co.,* 691 N.E.2d 1294, 1295 n. 2 (Ind.Ct.App. 1998).

### C. Public Policy Concerns

In our view, public policy militates strongly against imposing a duty of care upon a used-car dealership with respect to a driver, such as William, who has no relationship with the dealership and has no valid license to drive a vehicle purchased from the dealership. We do not mean to suggest that William's lack of a valid license was a proximate cause of his fatal accident, but we do believe that sound public policy weighs against holding Quality accountable for William's illegal operation of Harrison's vehicle. Our policy analysis is further buttressed by the fact that Quality repaired the Pontiac's brakes to Harrison's satisfaction in January 1998 and that Harrison and William experienced no problems with the braking system while driving more than 13,000 miles in three months.

In balancing the three factors mentioned in *Webb,* we conclude that William's attenuated relationship with Quality and the foregoing public policy considerations substantially outweigh the foreseeability of the harm at issue. Therefore, we must conclude that Quality did not owe a duty of care to William. The trial court did not err in granting Quality's motion for summary judgment.

Affirmed.

SHARPNACK and FRIEDLANDER, JJ., concur.

### ORDER

This Court having heretofore handed down its opinion in this appeal on August 20, 2002, marked Memorandum Decision, Not for Publication;

Comes now the Appellant, by counsel, and files herein Motion to Publish, alleging therein that the decision in this case greatly impacts the entire body of negligence law and affects the rights and obligations of the citizens of Indiana with its ruling and alleges that this opinion should be published as it meets the criteria of Appellate Rule 65(A).

The Court having examined said Motion to Publish, having reviewed its opinion in this case, noting that no response has been filed by the Appellee and being duly advised, now finds that the Appellant's Motion to Publish should be granted and this Court's opinion in this appeal should now be ordered published.

IT IS THEREFORE ORDERED that the Appellant's Motion to Publish is granted and this Court's opinion heretofore handed down in this cause on August 20, 2002, marked Memorandum Decision, Not for Publication, is now ordered published.