Glenn BRADY, Appellant–Plaintiff,

v.

ALLSTATE INDEMNITY COMPANY, Appellee–Defendant.

No. 71A03–0206–CV–181.

Court of Appeals of Indiana.

May 27, 2003.

Michael J. Anderson, Anderson, Agostino & Keller, PC, South Bend, IN, Attorney for Appellant.

Robert J. Konopa, Claire Konopa Aigotti, Konopa, Reagan & Kenyon, P.C., South Bend, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Glenn Brady appeals the trial court's grant of partial summary judgment in favor of Allstate Indemnity Company ("Allstate"). On appeal, Brady raises three issues for our review,[1] which we consolidate and restate as: whether the trial court erred in granting summary judgment on Brady's claims of bad faith and punitive damages because it found that there is no genuine issue of material fact as to whether Allstate breached its duty to deal with Brady in good faith.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On September 12, 1997, Brady was a passenger in a vehicle driven by Lisa Barley that was hit by a vehicle driven by Nathaniel Crain.[2] Brady sustained injuries to his arm and shoulder blade. Allstate insured Crain, whose policy allowed payment for bodily injury up to his $25,000 policy limit. Coincidentally, Allstate also insured Brady as a named insured under a policy issued to Barley ("Brady's policy"). Brady's policy provided for underinsured motorist ("UIM") coverage that entitled Brady to submit a UIM claim up to a $50,000 policy limit, less any underlying policy payments.

Under the terms of his policy, Brady could pursue a UIM claim only after being paid the $25,000 policy limit of Crain's underlying policy. Chris Good was Allstate's representative for Crain's underlying coverage, and James Yoder was Allstate's representative for Brady's UIM claim. Philip Marco was Allstate's Claims Supervisor and the person to whom both Good and Yoder reported.

Brady negotiated his underlying claim with Good while keeping Yoder apprised of his progress. Allstate questioned the extent of Brady's injuries on the underlying claim, but did not dispute that he incurred $7,307 in medical expenses and $9,480 in lost wages. *Appellant's Appendix* at 139. Ultimately, Allstate tendered to Brady the $25,000 limit from Crain's policy, but refused to pay anything on Brady's UIM claim. On July 6, 1998, Brady filed a complaint alleging that Allstate breached both the insurance contract and its duty of good faith toward Brady by failing to pay the UIM claim. The complaint prayed for the cost of the action, compensatory damages, and punitive damages for Allstate's breach of its duty of good faith.

On January 31, 2001, Allstate filed a motion for partial summary judgment on the breach of good faith and punitive damages claims. In support of this motion, Allstate designated evidence including pleadings, a copy of Brady's insurance policy, portions of Brady's deposition, and Marco's affidavit. In response to Allstate's motion for partial summary judgment, Brady's designated evidence included his complaint, Allstate's answer to the

---

**1.** Brady raised a fourth issue in his brief, but subsequently moved to withdraw that issue on October 18, 2002.

**2.** In the parties' briefs, Crain's name is spelled two different ways. We have selected the spelling used in the complaint, which is also the spelling most commonly found in the designated evidence.

complaint, portions of Brady's deposition, Brady's affidavit, and the affidavit of expert witness James Ludlow.

The designated facts most favorable to Brady as the nonmoving party reveal that his injuries initially prevented him from working. Brady reported this loss of income to Good, and, less than two weeks after the accident, Allstate paid him for two weeks of lost wages. This payment was an advance on the settlement of the underlying claim. On October 10, 1997, Brady spoke with Good about additional payment for lost wages and was informed that Good could not process the request without medical verification of the injuries and a disability statement regarding Brady's inability to work. Brady's treating physician, Dr. Charles Ware, submitted the requested verification of injuries and Allstate advanced Brady two more weeks of lost wages. Thereafter, Dr. Ware sent Good a confirmation that Brady was unable to work until further notice. During the next two months, Brady requested and Allstate paid five separate advances for additional lost wages, which collectively totaled $5,310.

On January 26, 1998, Brady sent a letter to Good in which he: (1) complimented Good for his "consummate professionalism in the way in which he ha[d] been handling the case;" (2) explained that his damages would far exceed $50,000; and (3) requested payment of both the $25,000 limit under Crain's Allstate policy and $25,000 in UIM payments under his own policy, the difference between the $50,000 limit and Crain's $25,000 limit. *Brady's Deposition* at 113; *Appellant's Appendix* at 59. Brady also sent a copy of this letter to Yoder. On February 3, 1998, Good informed Brady by telephone that the claim would be evaluated once pertinent medical records were received. Good also indicated that, although he would evaluate Brady's case, he could not guarantee that Brady had a "[UIM] limits case." *Appellant's Appendix* at 100. After learning that Brady was pursuing a UIM claim, Good attempted to settle the underlying Crain case for less than $25,000 on at least three separate occasions. These offers failed to include fourteen medical bills that Brady had previously submitted.

At the end of February or the beginning of March 1998, Brady contacted his physical therapist and instructed her not to release medical records to Allstate until Brady spoke to his attorney, Michael Anderson. On March 6, 1998, Good called Brady and informed him of the need for an independent medical examination. Brady refused the medical examination claiming that it violated his civil rights. Brady further asserted that, based on Allstate's refusal between January and March of 1998 to pay the policy limits requested, he planned to file a bad faith claim against both Allstate and Good.

On March 16, 1998, Marco spoke with Anderson and advised him that "Allstate would pay the policy limits on the policy covering Nathanial Crain (after adjusting for prepayments) to avoid needless litigation, but no additional evaluation could be made until an independent medical examination was performed and complete records received." *Appellant's Appendix* at 73. On May 13, 1998, Dr. Jonathan Javors conducted an independent medical examination on Brady and concluded that he had not fractured his shoulder blade in the accident. *Appellant's Appendix* at 61. Allstate determined that Brady's injuries did not exceed the $25,000 paid under Crain's policy and denied his UIM claim.

Ludlow, a former claims adjuster for Allstate, reviewed Brady's file and opined that his "claim was clearly in excess of [$25,000] based on a review of the type of injuries he received which included a possi-

ble fracture of his clavicle/scapula, some disability as a result of damages to his ulna[ ] nerve, lost wages and medical expenses which totaled in excess of [$14,-000]." [3] *Appellant's Appendix* at 145. Ludlow further averred that Good and Yoder had several conversations about proposed payments of the underlying and UIM claims, that Good and Crain reported to Marco, and that Marco was responsible for payments made under both policies.

Following a hearing, the trial court granted Allstate's motion for partial summary judgment on Brady's claim of bad faith and request for punitive damages. Noting that there was no just reason for delay, the trial court entered a final judgment with respect to its order. *See* Ind. Trial Rule 56(C). Brady now appeals.

## DISCUSSION AND DECISION

" 'The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law.' " *Holt v. Quality Motor Sales, Inc.,* 776 N.E.2d 361, 364 (Ind.Ct.App.2002), *trans. denied* (quoting *Harris v. Traini,* 759 N.E.2d 215, 220 (Ind.Ct.App.2001), *trans. denied* (2002)). " 'A trial court's grant of summary judgment is clothed with a presumption of validity on appeal, and the appellant bears the burden of demonstrating that the trial court erred. Nevertheless, the record must be carefully scrutinized to ensure that the plaintiff was not improperly denied a day in court.' " *Id.* at 364–65 (quoting *Lutz v. Fortune,* 758 N.E.2d 77, 81 (Ind.Ct.App.2001) (citation omitted), *trans. denied* (2002)).

" 'In determining the propriety of summary judgment, we apply the same standard as the trial court.' " *Id.* at 365 (quot-

ing *Harris,* 759 N.E.2d at 220). Under Indiana law, the party moving for summary judgment must demonstrate the absence of any genuine issue of material fact and only then is the nonmovant required to come forward with contrary evidence. *Shambaugh & Son, Inc. v. Carlisle,* 763 N.E.2d 459, 461 (Ind.2002); *Jarboe v. Landmark Cmty. Newspapers, Inc.,* 644 N.E.2d 118, 123 (Ind.1994); *Munsell v. Hambright,* 776 N.E.2d 1272, 1278 (Ind.Ct. App.2002), *trans. denied* (2003); *Farm Bureau Ins. Co. v. Allstate Ins. Co.,* 765 N.E.2d 651, 654 (Ind.Ct.App.2002), *aff'd on reh'g,* 770 N.E.2d 859, 860, *trans. denied.* The court must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmovant, and resolve all doubts against the moving party. *Masonic Temple Ass'n of Crawfordsville v. Indiana Farmers Mut. Ins. Co.,* 779 N.E.2d 21, 25 (Ind.Ct.App.2002).

Findings of fact and conclusions thereon made by the trial court offer valuable insight into the rationale for the judgment and facilitate our review; nevertheless, they are not binding on us. *Hoosier Ins. Co. v. Audiology Found. of America,* 745 N.E.2d 300, 305–306 (Ind.Ct.App.2001), *trans. denied; Interstate Cold Storage, Inc. v. General Motors, Corp.,* 720 N.E.2d 727, 730 (Ind.Ct.App.1999), *trans. denied* (2000). If the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we must affirm. *Farm Bureau Ins.,* 765 N.E.2d at 655; *Interstate Cold Storage,* 720 N.E.2d at 730.

Brady contends that the trial court erred when it granted Allstate's motion for summary judgment on Brady's bad faith and punitive damages claims. Brady ar-

---

**3.** Although Ludlow's opinion failed to specify whether "claim" referred to the whole claim or just the UIM claim, he appears to have been valuing the entire claim as being in excess of $25,000.

gues that the tactics used by Allstate to settle the underlying claim, i.e., offering less than $25,000 to preclude Brady from filing a UIM claim and sharing information between Good, Yoder, and Marco provide adequate evidence that Allstate's refusal to pay the UIM claim was done in bad faith and warrants punitive damages. Brady concludes, therefore, that Allstate was not entitled to judgment as a matter of law.

In *USA Life One Ins. Co. of Indiana v. Nuckolls,* 682 N.E.2d 534, 541 (Ind.1997), our supreme court explained as follows:

> "Under Indiana law, in order for a plaintiff to recover punitive damages from a breach of contract claim, the plaintiff must 'plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded.' *Miller Brewing Co. v. Best Beers,* 608 N.E.2d 975, 984 (Ind.1993). An insurance company has a duty to deal with its insured in good faith, and the breach of that duty allows for a cause of action in tort. *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 519 (Ind.1993). The erroneous denial of coverage does not necessarily violate an insurance company's duty of good faith. *Id.; Nelson v. Jimison,* 634 N.E.2d 509, 512 (Ind.Ct.App.1994). Furthermore, proof that a tort was committed does not necessarily establish the right to punitive damages. *Erie Ins.,* 622 N.E.2d at 520; *Nelson,* 634 N.E.2d at 512. Punitive damages may be awarded only if there is clear and convincing evidence that defendant 'acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.' [*Erie Ins.,* 622 N.E.2d] at 520."

The analysis of Brady's claim is somewhat complicated by the fact that All-

state is the insurer for both Brady and Crain. While Indiana law recognizes a legal duty implied in all insurance contracts for an insurer to deal in good faith with its insured, *Freidline v. Shelby Ins. Co.,* 774 N.E.2d 37, 40 (Ind.2002) (citing *Erie Ins.,* 622 N.E.2d at 518); *Masonic Temple Ass'n of Crawfordsville,* 779 N.E.2d at 26, this duty of good faith does not apply to an insurer's dealings with a claimant in a third party claim. *Menefee v. Schurr,* 751 N.E.2d 757, 760 (Ind.Ct. App.2001), *trans. denied* (2002); *see Cromer v. Sefton,* 471 N.E.2d 700, 703 (Ind.Ct. App.1984) ("[T]here is no duty or fiduciary relation running from the insurer to the injured plaintiff. The insurer's only duty is to the insured on its contract."). As such, Allstate owed Brady a duty of good faith on the UIM claim, but had no such duty while negotiating the underlying claim on Crain's policy.

The trial court noted that Allstate established a lack of genuine issues of material fact as to bad faith and punitive damages by showing that it made periodic payments to Brady pursuant to the underlying claim and by showing that delays in processing the claim, if any, were caused not by bad faith but by Brady's refusal to submit to an independent medical examination. The court also found that it could not speculate whether discussions between Yoder and Good were indicative of dishonest purpose or ill will, and noted that offers to settle the underlying claim for less than $25,000 merely revealed a difference in opinion over the value of the claim.

On appeal, Brady highlights the previously designated facts that Allstate undervalued the Crain claim and allowed communication among its claims adjusters as evidence that a genuine issue of material fact as to bad faith precludes summary judgment. Brady also asserts that Allstate's knowledge that he was in a finan-

cially precarious situation allowed it to try and pressure him into settling the underlying claim for less than it was worth. Finally, Brady offers that Ludlow averred that his claim was clearly in excess of Crain's $25,000 policy limit. *Appellant's Brief* at 10; *Appellant's Appendix* at 152.

■ Taking Brady's facts as true, his arguments are of no import. Both parties and the trial court mistakenly focused on actions taken by Allstate while it was settling the underlying Crain claim. If Brady and Crain had been covered by separate insurers, actions taken by Crain's insurer in valuing and settling the underlying claim could not have been used as evidence of bad faith in a suit by Brady against his UIM insurer. Allstate owed Brady no special duty in negotiating the underlying claim. Therefore, Allstate's discussions and attempts to settle the underlying claim for as little as possible, without more, cannot be used as evidence of Allstate's bad faith actions in refusing to pay the UIM claim.

■ An insurance company's ■obligation of good faith and fair dealing includes the obligation to refrain from[:] (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim." *Masonic Temple Ass'n of Crawfordsville*, 779 N.E.2d at 26 (citing *Erie*, 622 N.E.2d at 519). Here, the parties should have focused on whether Allstate pressured Brady to settle or made an unfounded refusal to pay the UIM claim.[4]

■ By mistakenly focusing on the actions taken while settling the underlying

claim, Allstate failed to satisfy its *Jarboe* burden of proving that there were no genuine issues of material fact concerning the nonpayment of the UIM claim. Nevertheless, we find that the following designated evidence supports granting partial summary judgment to Allstate on the punitive damages and bad faith claims. Brady was injured in an accident on September 12, 1997, was unable to attend work, and incurred expenses totaling $16,787—$7,307 in medical expenses and $9,480 in lost wages. Brady was initially satisfied with intermittent payments of medical bills and lost wages, but in January of 1998 informed Good that he was requesting the full payment of $50,000, $25,000 under Crain's policy and $25,000 under his own UIM coverage. Good responded that he could not guarantee that Brady had a "[UIM] limits case." *Appellant's Appendix* at 100. Allstate indicated that it would need to review Brady's medical records before settling his UIM claim. Allstate also stated that Brady would have to submit to an independent medical examination. Brady's insurance policy provided that an "injured person may be required to take medical examinations by physicians we choose, as often as we reasonably require." *Appellant's Appendix* at 79. Brady initially refused to release his medical records and did not agree to an independent medical examination until May 13, 1998. The examination revealed that Brady had not fractured his shoulder blade. Allstate paid Brady $25,000, but refused to pay anything under the UIM claim.

Brady's designated facts contain no evidence of medical bills or lost wages in excess of $16,787. While Ludlow opined that Brady's claim was worth in excess of

---

**4.** We note that Allstate had already settled with Brady for Crain's policy limits. If it had not done so, Brady would have been precluded from recovering under the UIM policy, and any claim for bad faith in this action would necessarily involve analysis of the appropriateness of Allstate's actions in settling the Crain claim for less than policy limits.

$25,000, Brady was requesting $50,000 under the combined underlying and UIM claims. A refusal to pay $50,000 when the claim is only alleged to be in excess of $25,000 and actual losses are less than $17,000 is not sufficient evidence of bad faith to preclude summary judgment.

Likewise, Brady's claim of contact between Good, Yoder, and Marco, without more, does not give rise to a finding of bad faith. A UIM insurer is often kept apprised by its insured of amounts offered in the settlement of an underlying claim and even has the right to intervene in a tort action between its insured and the underinsured motorist, with the goal of keeping the primary insurer's settlement amount to a minimum. *See Johnston v. State Farm Mut. Auto. Ins. Co.,* 667 N.E.2d 802, 803 (Ind.Ct.App.1996), *trans. denied* (injured party's attorney kept UIM insurer apprised of the progress of proceedings with the primary insurer); *see also Westfield Ins. Co. v. Axsom,* 684 N.E.2d 241, 245 (Ind.Ct.App.1997) (holding that UIM insurer has right to intervene in tort action by injured insured against tortfeasor underinsured motorist). Brady even contributed to the sharing of knowledge by keeping in touch with both Good and Yoder and by sending each a carbon copy of his correspondence.

In *Johnston,* we addressed a summary judgment analysis with facts similar to those before us today. Johnston was a passenger in a vehicle and was injured when a vehicle driven by Kunkel collided with his car. State Farm Mutual Automobile Insurance Company ("State Farm") insured Johnston with a UIM policy limit of $250,000. Kunkel was insured by Illinois Farmers Mutual Insurance Company ("Farmers") and had a policy limit of $50,000. Johnston made a claim against Kunkel and also filed suit against him.

During negotiation of the underlying claim with Farmers, State Farm was kept apprised of the proceedings and was informed that Johnston intended to file a UIM claim. Johnston claimed medical expenses and lost wages in the amount of $27,000. Although worker's compensation had paid $16,000 of Johnston's expenses, he claimed damages well in excess of $1,000,000 due to lost wages and chronic pain. Farmers ultimately settled with Johnston for the policy limit of $50,000, but State Farm offered only $25,000 of its potential $200,000 UIM limit—the $250,000 UIM limit minus the $50,000 settlement.

After settling with Farmers, Johnston amended his complaint to add State Farm as a defendant, and Kunkel was dismissed from the case. In his suit against State Farm, Johnston alleged that his insurer was liable for punitive damages for employing abusive and harassing tactics in denying and refusing to pay his UIM claim. State Farm filed a motion for summary judgment on the claims of bad faith and punitive damages, and the trial court granted the motion.

In affirming the trial court's grant of summary judgment, we commented as follows:

> "Although technically a claim for breach of an insurance contract, Johnston's claim against State Farm is, in essence, a claim for personal injuries including pain and suffering. In personal injury actions, the trier of fact is not required to award substantial damages for lost income, permanent impairment, or pain and suffering. Such an award depends upon the evidence. Damages for pain and suffering are of necessity a jury question which may not be reduced to fixed rules and mathematical precision. Although the actual medical bills incurred may constitute evidence of the reasonable value of the services provid-

ed, such bills are not dispositive of the determination of the reasonable medical expenses to be awarded to an injured plaintiff.

The properly designated evidence reveals nothing more than a good faith dispute regarding the value of Johnston's UIM claim. The properly designated evidence regarding the value of Johnston's personal injuries is not of such a quality that it clearly demonstrates that Johnston's damages exceed the UIM policy limit of $250,000.00. Therefore, the trial court properly determined that Johnston's claim for the tortious breach of State Farm's duty to exercise good faith could not survive summary judgment. And, as the viability of Johnston's claim for punitive damages rests upon the viability of his tort claim, the trial court correctly entered summary judgment on this count as well. Johnston has failed to meet his burden of demonstrating that the trial court erred in entering summary judgment against him. Therefore, we find no error."

*Johnston*, 667 N.E.2d at 806.

Viewing the facts and inferences surrounding Brady's UIM claim in the light most favorable to Brady, we find that the properly designated evidence reveals nothing more than a good faith dispute regarding the value of Brady's UIM claim. As we concluded in *Johnston*, the evidence regarding the value of Brady's personal injuries is not of such a quality that it clearly demonstrates that his damages warrant payment by Allstate of the $25,000 UIM claim—the $50,000 limit minus Crain's settlement. Therefore, Brady's claim for the tortious breach of Allstate's duty to exercise good faith may not survive summary judgment. Since the viability of Brady's claim for punitive damages rests upon the viability of his tort

claim, summary judgment is appropriate on this count as well. Brady has failed to meet his burden of demonstrating that the trial court erred in entering summary judgment against him. Therefore, we find no error.

Affirmed.

SHARPNACK, J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

I concur and write separately merely to voice the opinion that this case reflects the dilemma which is inherently present when the same insurance company has two policies—one on the tortfeasor and one on the plaintiff for an underinsured motorist claim. There is a tension which may arise in the handling of the two separate claims when the settlement of one such claim negatively impacts the insurer's liability upon the second policy.

Even if there is no conflict of interest in the actual handling of the two claims, an appearance of impropriety may surface. The subtleties of the relationships among and between those involved is magnified when, as here, the same claims supervisor has responsibility with regard to the two separate claims.

Be that as it may, I agree that, as a matter of law, Allstate did not breach a duty of good faith dealing with Brady and was therefore not liable for punitive damages.