# FOR PUBLICATION



FILED
Aug 07 2013, 5:39 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ANDREW M. SUMERFORD**
Meils Thompson Dietz & Berish
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**JAMES R. WILLIAMS**
**SCOTT E. SHOCKLEY**
**MATTHEW L. KELSEY**
DeFur Voran LLP
Muncie, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

WESTMINSTER PRESBYTERIAN    )
CHURCH OF MUNCIE, an Indiana    )
Non-Profit Corporation,    )
    )
    Appellant-Defendant,    )
    )
    vs.    )    No. 18A02-1210-CT-791
    )
YONGHONG CHENG and    )
HONGJUN NIU, Husband and Wife,    )
as parents of    )
MATTHEW CHENG, deceased,    )
    )
    Appellees-Plaintiffs.    )
    )

INTERLOCUTORY APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable John Feick, Judge
Cause No. 18C04-1003-CT-02

**August 7, 2013**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

After the death of their four-month-old son while under the care of a babysitter recommended by a pastor at their church, Yonghong Cheng and Hongjun Niu ("June") (collectively, "the Chengs") brought suit against Westminster Presbyterian Church ("Westminster") for wrongful death, invasion of privacy, and intentional infliction of emotional distress. Westminster moved for summary judgment on all counts; the trial court denied the motion in regards to the wrongful death and invasion of privacy claims, but it granted the motion in regard to the intentional infliction of emotional distress claim. Westminster appeals, and the Chengs cross-appeal.

Under a *Webb v. Jarvis* analysis, we find that there was no duty of care as a matter of law in this case, when a pastor recommended a babysitter to a parishioner and the child died while in the babysitter's care. We also find that when the church issued a press release about the death that included the family and child's names, there was no invasion of privacy because the church did not intrude upon the family's physical seclusion or profit off of the family's name, and no intentional infliction of emotional distress because the conduct did not rise to the level of outrageous. We therefore affirm in part, reverse in part, and remand with instructions for the trial court to enter summary judgment in favor of Westminster on all counts.

**Facts and Procedural History**

Westminster, located in Muncie, Indiana, has approximately 425 members. Dr. Gary Cox is the Pastor, and Kristofer Holroyd is the Associate Pastor. There is also a

Chinese Christian fellowship at Westminster that uses the facility, but it has its own pastor, worship service, and fellowship time.

The Chengs began attending Westminster in 2005. They attended Westminster's regular Sunday services and June sang in the choir; they were not members of the Chinese Christian fellowship. Their son, Matthew, was born in September 2009, and due to their fears Matthew would contract the flu, Matthew and Yonghong would usually stay home from services on Sundays.

Around January 1, 2010, June got a job with Love's Tax Service and was expected to start on January 4, resulting in a search for a babysitter for Matthew. June contacted Joy Wegener, a woman she knew through Bible study at Westminster, and asked if she would babysit. Wegener initially agreed, but she later changed her mind and called June to decline. Wegener mentioned Tina Byrd as a possible alternative, telling June that Byrd was also from Westminster. Wegener gave Byrd's phone number to June, and June called and left a message for her that day. However, June was still hoping that Wegener would change her mind, so she went over to Wegener's house to talk to her. Wegener still declined; she then called another woman from Westminster who also declined. At this point, according to June, Wegener called Holroyd and told him that "June is here trying to find child care for Matthew." Appellee's App. p. 691. However, according to Holroyd, Wegener told him that her "Chinese friend" was looking for someone to babysit her baby and asked him if he knew anyone to recommend. Appellant's App. p. 110. Holroyd said "Tina is taking babies." *Id.* at 122. Wegener then asked Holroyd if any college students from Westminster could babysit, and Holroyd said he would send out an

email to check. Holroyd testified he did not know that June was with Wegener at the time of the call, and he did not mention that a baby had died while in Byrd's care just two months before. *Id.* at 110. Holroyd also did not think that he was making a recommendation to anyone to use Byrd as a babysitter, nor did he consider the phone call to be one seeking pastoral advice. *Id.* at 112-13.

Before June left Wegener's house, Byrd called back and indicated that she could babysit Matthew. Byrd asked June how old Matthew was and whether he was on formula, and she told June that if she decided to hire her, Byrd would email her a list of things to bring. Byrd also told June that she could start the next day, January 4. June did not hire Byrd at this time; she discussed the matter with Yonghong and called Byrd later to let her know that they were going to hire her. June said that they would be able to pay Byrd $80 per week, and Byrd agreed to the amount. June did not do any other research on Byrd, and Byrd gave June no more information.

About two months before, however, in mid-October 2009, Byrd started babysitting the baby of another family from Westminster. On November 3, 2009, Byrd put him down for a nap and the baby died. When the baby was discovered, he was unresponsive in his crib, so Byrd and her daughter called 911 and Byrd performed CPR. The baby's death was ruled by the coroner to be "a case of Sudden Unexpected Infant Death (SUID)," with the official manner of death being "undetermined." *Id.* at 260. Byrd was questioned by the police and the Indiana Department of Child Services, but she was never charged. The baby's death was well known within the Westminster community.

After the baby's death, Byrd did not think she would babysit again. However, Byrd's father had helped her financially after she got divorced, and he passed away shortly after the baby's death. Byrd's ex-husband was also behind on child-support payments, so Byrd returned to babysitting in order to start earning money again.

Byrd began babysitting Matthew on January 4, 2010. The first day, June took Matthew to Byrd's house, staying for thirty to forty minutes to feed him before going to work. Around 12:30 or 1:00 p.m., Byrd called June, telling her she "couldn't do it," so June called Yonghong to pick Matthew up from Byrd's house. *Id.* at 132. Byrd said that Matthew "kept on crying" and that she could not handle it and did not want to babysit anymore. *Id.* at 133. When Yonghong picked Matthew up, Byrd suggested that they try bottle feeding him, and that when Matthew was ready, they could try having her babysit him again. The Chengs worked on weaning Matthew off of breast feeding, and the next week they dropped him back off at Byrd's house without issue.

On January 19, 2010, June dropped Matthew off at Byrd's house. At 2:15 that afternoon, when Matthew was sleeping, Byrd left the house to pick up her daughter from school and make another stop, leaving Matthew alone in the house. She had checked on Matthew about ten minutes before she left, and he seemed to be asleep on his side. *Id.* at 142. Byrd's nineteen-year-old daughter, Kassey, worked at a preschool about five minutes from the house, and she was expected home soon after the school let out around 2:00 p.m. When Byrd returned home with her other daughter, Kataryna, Kassey was already there. Kataryna went into the room where Matthew had been sleeping and found him dead in the crib. Byrd started CPR and 911 was called. June was not notified about

5

Matthew's death until she came to Byrd's house to pick him up and was met by Byrd's son who told her, "your baby died." Appellee's App. p. 696. Byrd was questioned by the police and initially lied about her whereabouts that afternoon, as well as how she positioned Matthew for his nap. As a result, Byrd pled guilty to obstruction of justice.

Dr. Cox first learned of Matthew's death around 3:00 p.m. that day, and he and his wife first went to the police station where Byrd was. They then went to the hospital where the Chengs were, along with Holroyd and another Westminster member. Dr. Cox believed that the Chengs were part of the Chinese Christian fellowship, but he did not see anyone from the Chinese ministry there, so he advised the hospital chaplain that he was their pastor and prayed for the Chengs. *Id.* at 350. While at the hospital, Dr. Cox described June's condition as: "In all my years of pastoral ministry, I have never seen someone that visibly distraught, wailing . . . she was inconsolable at that time." *Id.* at 349. Dr. Cox then drove the Chengs to their house and left at their request so that they could grieve as a family. Dr. Cox also gave the Chengs his phone number, telling them that he would call the next day, which he never did.

Later that night, Holroyd contacted Westminster's media expert to craft a proposed media statement. The next day, Dr. Cox circulated a draft to all the church elders, and he later held a press conference, releasing the following statement to the press:

> Yesterday was a tragic and heartrendering day for the Westminster Presbyterian Church family, and especially the Cheng family who lost their infant son, Matthew. Our congregation knew this family through a Chinese Christian fellowship that uses our facilities for their worship services. Tina Byrd, Matthew's babysitter and a member of our church, was asked by the Chengs to care for Matthew in her home. This child care is not a ministry

of Westminster Presbyterian Church, it is not a part of our outreach endeavors, nor do we refer anyone to any child care ministries.

I was called to the home at 3:00 PM yesterday to provide pastoral support and ministry to the Byrd family and then later, at Ball Memorial Hospital, to the Cheng family. As you can imagine, both the parents and the babysitter are devastated over the loss of Matthew, and our church family grieves and is praying for all of those impacted by Matthew's sudden and unexpected death. In the days and weeks ahead our congregation will rally around these families and their children to love them in the Lord and care for them as much as possible. Thank you for your time.

Tr. p. 12-13. The accuracy of the facts in the statement was not checked by anyone else, and Dr. Cox erroneously referred to the Chengs as members of Westminster's Chinese Christian fellowship.

An autopsy was performed on Matthew, and his cause of death was determined to be "Sudden Unexplained Infant Death (SUID), cause undetermined." Appellant's App. p. 150. The autopsy report also stated that "[r]isk factors identified for his death include prematurity, prone sleeping position, and death under uncertain household circumstances." *Id.*

On March 15, the Chengs filed their wrongful death complaint against Westminster and Byrd. Eight months later, they filed an amended complaint, adding a count alleging intentional infliction of emotional distress. The parties attempted mediation, but they were unsuccessful. Westminster then filed a motion for summary judgment. The Chengs filed a memorandum in opposition, and Westminster moved to strike the affidavits of three experts designated by the Chengs because they were disclosed after the deadline for doing so. The trial court denied the motion to strike but granted Westminster leave to depose the experts and raise the issue later. The Chengs

7

filed a second amended complaint, adding Holroyd as a party defendant. Westminster filed a reply brief and renewed its motion to strike the experts' affidavits. Holroyd was later dismissed as a defendant.

The trial court held a hearing on Westminster's motion for summary judgment on August 9, 2012. Two weeks later, it entered an order granting summary judgment for Westminster on the Chengs' claim of intentional infliction of emotional distress but denying summary judgment in all other respects. The trial court also denied Westminster's motion to strike the Chengs' experts' affidavits. Westminster asked the trial court to certify its order for interlocutory appeal, which the trial court did. This Court accepted jurisdiction over the interlocutory appeal on November 14, 2012.

**Discussion and Decision**

When reviewing the entry or denial of summary judgment, our standard of review is the same as that of the trial court: summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269 (Ind. 2009). All facts established by the designated evidence, and all reasonable inferences from them, are to be construed in favor of the nonmoving party. *Naugle v. Beech Grove City Sch.*, 864 N.E.2d 1058, 1062 (Ind. 2007).

Westminster contends that the trial court erred in denying its motion for summary judgment in regards to the Chengs' claims for wrongful death and invasion of privacy. It also contends that the trial court erred by not striking the affidavits of the Chengs' expert witnesses. On cross-appeal, the Chengs contend that the trial court erred in granting

8

summary judgment in favor of Westminster on their claim for intentional infliction of emotional distress. We hold that the trial court did not err in granting Westminster's summary-judgment motion on the claim for intentional infliction of emotional distress, but that the trial court did err in denying Westminster's summary-judgment motion on the claims for wrongful death and invasion of privacy. Since we find that summary judgment is appropriate for Westminster on all counts, we need not address the issue concerning the expert-witness affidavits.

## I. Negligence

Westminster argues that the trial court erred in denying its motion for summary judgment on the wrongful death claim because it did not owe a duty to the Chengs as a matter of law.[1] We agree.

Whether a duty exists is generally a question of law, *Estate of Heck v. Stoffer*, 786 N.E.2d 265, 268 (Ind. 2003), and in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), our Supreme Court articulated a balancing test to determine whether a duty exists. In order to impose a duty at common law, the court must balance (1) the relationship between the parties, (2) the reasonable foreseeability of the harm to the person injured, and (3) public-policy concerns. We hold that the trial court erred in denying Westminster's motion for summary judgment on the negligence claim, as a balancing of the *Webb* factors under these circumstances shows that Westminster did not owe a duty of care to the Chengs as a matter of law.

---

[1] Westminster also argues that its actions were not the proximate cause of Matthew's death because the official cause of his death was Sudden Unexpected Infant Death. However, because we find that Westminster owed no duty to the Chengs in this case, we need not address this argument.

*A. Relationship Between the Parties*

It is clear that there was some relationship between the parties involved in this case. Holroyd, an Associate Pastor at Westminster, provided Byrd's name to the Chengs through Wegener as a potential babysitter for Matthew. This interaction is sufficient to create a relationship between the two parties.

The Chengs, however, contend that this created the pastor-parishioner relationship—one that this Court has said creates a fiduciary/confidential relationship. *See, e.g.*, *Leever v. Leever*, 919 N.E.2d 118, 123 (Ind. Ct. App. 2009). Regardless of whether Holroyd was aware that June was with Wegener during the phone conversation in which he provided Byrd's name as a potential babysitter, it is clear that there was no special pastor-parishioner relationship created in this situation.

The fact that Holroyd was a pastor, standing alone, does not create a fiduciary relationship between him and the Chengs. *See J.A.W. v. Roberts*, 627 N.E.2d 802, 810 (Ind. Ct. App. 1994) ("J.W. cites no authority in support of his position that status, standing alone, creates a special relationship and our own research reveals no such authority."), *abrogated on other grounds by Holt v. Quality Motor Sales, Inc.*, 776 N.E.2d 361 (Ind. Ct. App. 2002), *trans. denied.* "[W]hether a special relationship exists is fact sensitive and dependent on the level of interaction or dependency between the parties that surpasses what is common or usual." *Id.* In *J.A.W.*, for example, a child was molested by his foster father and alleged, among other things, that three counselors and clergy had a duty to report the molesting because of their special relationship with the child. After first noting that status as a counselor or clergy alone did not automatically

10

create a special relationship, we further evaluated the relationship between the adults and the child. In addressing those relationships, a significant factor that was relevant in the analysis was whether the counselor and clergy counseled the child specifically about the molesting that he was enduring. *Id.* at 810-11. When the counselor or clergy merely knew of the molesting or spoke generally to the child about the molesting, we did not find those interactions sufficient to create a special relationship. *Id.* It was only where the child sought confidential help from a clergy member specifically concerning the molesting that we found that there was a question of fact as to whether that special relationship was created. *Id.* at 811.

In this case, the relevant facts show that there was no special relationship created. June received the information about Byrd through an intermediary, Wegener, rather than directly and confidentially from Holroyd. There is also no showing that this advice from Holroyd was special counseling that June was dependent on him for; rather this was readily available public information that she could have received from any number of people. The information sought was also general in nature, as Holroyd was asked if he knew of anyone to recommend as a babysitter and not specifically about Byrd and her qualifications as a babysitter. Finally, we note that the nature of the inquiry was personal and not related to the church, as childcare was not a ministry of Westminster and its pastors. Therefore, while there was a relationship between Holroyd acting on behalf of Westminster and the Chengs, there is nothing to indicate that the level of interaction and dependency between June and Holroyd was great enough to trigger a special pastor-parishioner relationship that the Chengs contend gives rise to Westminster's liability.

11

## B. Reasonable Foreseeability of the Harm

Under the *Webb* analysis, harm is foreseeable if "the person actually harmed was a foreseeable victim and . . . the type of harm actually inflicted was reasonably foreseeable." 575 N.E.2d at 997. In this case, Matthew's death, while tragic, was not reasonably foreseeable.

Matthew died from "Sudden Unexplained Infant Death (SUID), cause undetermined." Appellant's App. p. 150. While the autopsy provided risk factors for Matthew's death, the cause of death could not be definitively determined or explained. With no answers as to how or why Matthew died, we cannot say that he was a foreseeable victim or that his death was reasonably foreseeable. There was nothing about Byrd's house that the coroner was able to point to that caused Matthew's death, so Byrd babysitting Matthew did not foreseeably place him in danger of dying.

The Chengs also contend that Holroyd had a duty to warn them about the death of the baby that happened two months before Matthew was placed under Byrd's care. While another baby had died while under Byrd's care just a few months before Matthew, the cause of that death was also ruled to be "a case of Sudden Unexpected Infant Death (SUID)," with the official manner of death being "undetermined." *Id.* at 260. By its very name, the death therefore was unexpected, and the reason for the death was undetermined. We cannot say that Westminster should have known that another baby was likely to die from SUID while in Byrd's care. Therefore, it would not be reasonable to impose a duty on Holroyd to warn future parents that a child had previously died in Byrd's care from SUID.

12

*C. Public Policy Concerns*

The public policy concerns at issue here are great. Society has an expectation that liability will attach for certain actions, but not for mere recommendations that are freely and frequently given as a part of daily life. Wegener called Holroyd and asked him if he knew anyone to recommend for child care. In this situation, no one would expect that a recommendation given by a church's associate pastor would subject the church to potential liability if the recommendation given results in any sort of harm. In order to assume a duty, the defendant "must have specifically and deliberately undertaken the duty." *Holtz v. Hilliard Lyons, Inc.*, 185 F.3d 732, 744 (7th Cir. 1999). That deliberation is noticeably absent in a case such as this, where Holroyd was contacted and asked for advice; Westminster did not deliberately set out to undertake the duty of insuring the safety of a child under Byrd's care. We therefore cannot say that it would be fair to place such a burden on the recommender.

Indiana courts have failed to place this burden on employers who recommend former employees to a new job, *see Passmore v. Multi-Management Services, Inc.*, 810 N.E.2d 1022, 1028 (Ind. 2004) ("declaring employers liable for negligence in providing employment references will lead universally to employer reluctance to provide any information other than name, rank, and serial number"). Likewise, we will not impose a duty on persons who merely make recommendations to others of service providers.

After analyzing the three *Webb* factors, we conclude that Westminster did not owe a duty to the Chengs as a matter of law. We find that the trial court erred in denying Westminster's motion for summary judgment on the Chengs' wrongful-death claim. We

13

therefore reverse and remand with instructions that the trial court enter summary judgment in favor of Westminster on the Chengs' wrongful-death claim.

## II. Invasion of Privacy Claims

Westminster also contends that the trial court erred by denying its motion for summary judgment on the privacy claims brought by the Chengs. There are four sub-torts under invasion of privacy: (1) false light; (2) public disclosure of private facts; (3) intrusion upon seclusion; and (4) appropriation of likeness. *Newman v. Jewish Cmty. Center Ass'n of Indianapolis*, 875 N.E.2d 729, 736 (Ind. Ct. App. 2007), *trans. denied*. The Chengs abandon their claim of false light, Appellee's Br. p. 38, and public disclosure of private facts is not a recognized cause of action in Indiana. *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 693 (Ind. 1997). Therefore, we need only address the Chengs' claims for intrusion upon seclusion and appropriation of likeness.

### A. Intrusion Upon Seclusion

The Chengs allege that Westminster intruded upon their seclusion by issuing a press release and holding a press conference concerning Matthew's death. They claim that these actions "interfered with [their] reasonable expectation and interest in solitude and seclusion by publicizing . . . private affairs and concerns . . . ." Appellant's App. p. 433-34. Westminster contends that the trial court erred in not granting summary judgment in its favor on this claim. We agree.

Intrusion upon seclusion occurs when there is "an intrusion upon the plaintiff's *physical* solitude or seclusion as by invading his home or conducting an illegal search." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (emphasis added). In order to rise to

14

this level, "the intrusion must be something which would be offensive or objectionable to a reasonable person." *Curry v. Whitaker*, 943 N.E.2d 354, 358 (Ind. Ct. App. 2011). Because this tort "requires intrusion into the plaintiff's private 'physical' space," *id.* (citing *Creel v. I.C.E. & Associates, Inc.*, 771 N.E.2d 1276, 1280 (Ind. Ct. App. 2002), *reh'g denied*), and in this case, there was no intrusion into the Chengs' private physical space such as their home, this tort has no application as a matter of law.

The Chengs argue, however, that this Court has previously found that intrusion upon seclusion can apply to intrusion into emotional solace. *See Newman*, 875 N.E.2d at 736. However, in that case, this Court said that "[w]hile the tort arguably embraces intrusion into emotional solace, [t]here have been no cases in Indiana in which a claim of intrusion was proven without physical contact or invasion of the plaintiff's physical space such as the plaintiff's home." *Id.* (internal quotations and citations omitted). Like in *Newman*, we decline to make such an extension of the intrusion into seclusion tort in this case, and we therefore hold that the trial court erred in denying Westminster's motion for summary judgment on this count because there was no invasion of the Chengs' physical space.

### B. *Appropriation of Name or Likeness*

An appropriation of name or likeness claim is available when an individual uses the plaintiff's name or likeness for his own benefit. The most common form of this tort is when a plaintiff's name or likeness is appropriated "to advertise the defendant's business or product, or for some other similar commercial purpose." Restatement (Second) of Torts, § 652C cmt. b (1977). In their complaint, the Chengs contend that Westminster

15

appropriated their name in the press release and during the press conference for its benefit. Westminster, however, contends that the trial court erred by not granting summary judgment in its favor on this claim because the use of the Chengs' name in the press release was both incidental and not done for a commercial purpose. We agree.

Indiana courts have rarely examined this invasion-of-privacy tort, but our Supreme Court did address it in the case of *Felsher v. University of Evansville*, 755 N.E.2d 589 (Ind. 2001). While this case found that the university was not entitled to privacy because it was a corporation, in coming to this conclusion, our Supreme Court relied on the Restatement (Second) of Torts, § 652.

Section C of Restatement (Second) of Torts, § 652 deals with appropriation of name or likeness. How the cause of action is evaluated depends on whether the use of the name was incidental or for the defendant's benefit. Westminster contends that the use of the Chengs' name in the press release was incidental, while the Chengs argue that their name was used for Westminster's benefit in distancing itself from Matthew's death. We agree with Westminster, however, and find that the use of the Chengs' name in the press release was incidental. Their name was merely mentioned in the press release as part of a story of public concern; it was not used in any way except to identify the parties that were involved in the situation surrounding Matthew's death.

Comment (d) concerns situations in which the use is incidental. It states in relevant part:

> No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. *It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial*

16

*or other values associated with the name or the likeness that the right of privacy is invaded.*

Restatement (Second) of Torts, § 652C (1977) (emphasis added).  The Chengs therefore have no right not to have their name used in the press release, since their name is not a private matter.  Despite the fact that the incident at issue was sensitive as it involved the death of an infant, that does not change the fact that there is no privacy right in one's name such that it can be kept out of the public's view.  Therefore, there must have been some sort of commercial value appropriated to Westminster as a result of its use of the Chengs' name for the Chengs' claim under this cause of action to be viable.

We find that there was no commercial value appropriated to Westminster due to its use of the Chengs' name in the press release.  The press release identified the parties involved and explained the situation, and we fail to see how that use was intended to create a commercial advantage from the use of the Chengs' name.  We therefore hold that the trial court erred in denying Westminster's summary-judgment motion on this count as well because there has been no appropriation of name or likeness as a matter of law.

We reverse the trial court's denial of Westminster's summary-judgment motion on the Chengs' invasion-of-privacy claims, and we remand with instructions to grant summary judgment in favor of Westminster on these claims.

## IV.  Intentional Infliction of Emotional Distress

Finally, the Chengs contend that the trial court erred by granting Westminster's summary-judgment motion on their intentional infliction of emotional distress (IIED) claim.  We disagree.

17

Our Supreme Court has defined the tort of IIED as "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Cullison*, 570 N.E.2d at 31. The elements of the tort are that the defendant: (1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another. *Id.* The requirements to prove this tort are "rigorous." *Id.* Importantly, however, "[i]t is the intent to harm the plaintiff emotionally which constitutes the basis for the tort of intentional infliction of emotional distress." *Id.* In *Bradley v. Hall*, we quoted the Restatement (Second) of Torts with approval, which says:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or by a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). IIED therefore is found where conduct exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind. *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009).

In this case, the Chengs contend that Westminster's actions of "deceiving the public about circumstances related to the Plaintiffs and Matthew's death, and then

18

abandoning them thereafter despite public proclamations to the contrary," Appellee's Br. p. 42, rise to the level of "outrageous." We cannot agree.

This Court has previously found that there has to be intent to cause emotional harm to the plaintiff. *Cullison*, 570 N.E.2d at 31; *see also Johnson ex rel. Ind. Dep't of Child Servs. v. Marion Cnty. Coroner's Office*, 971 N.E.2d 151, 162 (Ind. Ct. App. 2012), *trans. denied*. While the Chengs argue that Westminster's actions were intentional, there is no evidence to conclude that Westminster had any intent to emotionally harm the Chengs. Dr. Cox came to the hospital on the day of Matthew's death to console and pray with the family. Appellant's App. p. 349-50. While he said that he would follow-up with the Chengs and he failed to do so, there is no evidence that shows that this was done with the intent to harm the Chengs. This may have been insensitive, but it does not rise to the outrageous level required to succeed on an IIED claim. *Compare Cullison*, 570 N.E.2d at 27 (summary judgment dismissing IIED claim appropriate when neighbor grabbed at his holstered gun and shook it at plaintiff during an altercation), *and York v. Frederick*, 947 N.E.2d 969 (Ind. Ct. App. 2011) (summary judgment dismissing IIED claim appropriate when funeral-home personnel forced the plaintiff's grandmother's casket into the vault, resulting in damage to the casket and moisture and dirt inside the casket), *trans. denied*, *and Lachenman v. Stice*, 838 N.E.2d 451 (Ind. Ct. App. 2005) (summary judgment dismissing IIED claim appropriate when dog owners negligently permitted their dogs to fatally attack a neighbor's dog), *reh'g denied*, *trans. denied*, *with Bradley*, 720 N.E.2d at 747 (summary judgment dismissing

IIED claim inappropriate when employer asked employee about her menopause and asked if her husband was impotent due to his diabetes).

The Chengs argue that Westminster should be presumed to intend the natural and probable consequences of its actions, and that a reasonable person would know that Westminster's actions would result in emotional harm to the Chengs. Again, we do not see how this conduct rises to the extreme and outrageous level required to satisfy this particular tort such that Westminster should have known that it was going to cause such great emotional harm to the Chengs. We therefore find this argument to be without merit, and we find that the trial court did not err in granting Westminster's motion for summary judgment on the Chengs' IIED claim.

Affirmed in part, reversed in part, and remanded with instructions.

KIRSCH, J., and PYLE, J., concur.